**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| MINNIE A. BAYNHAM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:11-cv-0129-TWP-MJD |
| v. | ) | |
| | ) | |
| MERIDIAN SERVICES CORP., | ) | |
| | ) | |
| Defendant. | | |

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on Defendant, Meridian Services Corp's. ("Meridian") Amended Motion for Summary Judgment (Dkt. #60). In the Spring of 2008, Plaintiff, Minnie A. Baynham ("Ms. Baynham"), sought work as a medical assistant with Meridian, but, when told that no medical assistant position were available at that time, she accepted a position as a unit secretary. During the time she worked for Meridian, Ms. Baynham sought to transfer to a medical assistant position on several occasions, but never received such an assignment. In June 2010, Meridian terminated Ms. Baynham after she received a disciplinary write-up for insubordination, her fourth written disciplinary warning within a year. Ms. Baynham brings this lawsuit pursuant to Title VII of the Civil Rights Act of 1964 and Section 1981 of the Civil Rights Act of 1866, claiming that she faced racial discrimination and harassment while employed with Meridian and that she was terminated because of her race, African American, or in retaliation for having complained of illegal discrimination.

For the reasons explained in this Entry, the Court finds that no genuine material question of fact remains and no reasonable jury could conclude that Ms. Baynham's claims have merit. A separate judgment shall issue in favor of Meridian.

## I.  <u>STANDARD OF REVIEW</u>

As the Seventh Circuit has articulated, "summary judgment is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events."  *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008).  Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 489–90 (7th Cir.2007).  In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor."  *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir.2009).  However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial."  *Hemsworth*, 476 F.3d at 490.  And, importantly, the court will consider evidence offered in support or defense of the motion only if it would be admissible at trial.  *Gustovich v. AT&T Communications, Inc.*, 972 F.2d 845, 849 (7th Cir. 1992).

## II.  <u>FACTUAL BACKGROUND</u>[1]

Meridian is a health services organization based in Muncie, Indiana which provides a range of diagnostic, therapeutic, counseling and support services through various facilities located in central and eastern Indiana.  In 1986, Ms. Baynham passed a six-month program

---

[1] Pursuant to FRCP 56 and Local Rule 56.1, the Court has assumed the accuracy of properly supported assertions of fact in the movant's Statement of Material Facts Not in Dispute, unless Ms. Baynham has challenged the same in her Statement of Material Facts in Dispute with proper reference to supporting admissible evidence.

offered by Ivy Tech which qualified her as a medical aid capable of passing medication.  Ms. Baynham is also registered as a certified medical assistant ("MA") by the National Allied Health Test Registry, having completed a certification program at Brown Institute in Minneapolis, Minnesota in 1995.  In early 2008, having returned to Muncie, Indiana from Minnesota, Ms. Baynham was informed by an acquaintance, who worked at Meridian, that Meridian employed MAs.  Ms. Baynham provided that acquaintance with her resume to submit to Meridian for employment consideration.

Donna Ross ("Ms. Ross"), Meridian's Human Resources Manager, telephoned Ms. Baynham in early March 2008 to ask if she was interested in working as a MA.  Ms. Baynham responded that she was interested in the position. When Ms. Baynham arrived at Meridian's outpatient facility in Muncie, Indiana to complete an application and be interviewed, Ms. Ross informed her that the MA position she had referred to was no longer available, but that there was an available MA position "across the street" at Ball Memorial Hospital ("Ball Memorial"). Ms. Ross asked permission to forward Ms. Baynham's resume so that she could be considered for that position.  Ms. Baynham was unaware at that time that Meridian partnered with Ball Memorial on certain of its in-patient programs.  In any event, Ms. Baynham questioned Ms. Ross as to why a hospital would be hiring an MA, because Ms. Baynham understood that only doctors' offices, clinics and other out-patient facilities hired MAs.  According to Ms. Baynham, Ms. Ross really never addressed her question regarding why there would be an MA position at a hospital, but Ms. Ross kept repeating that there were MA positions "across the street" and that getting her "foot in the door" would be important.  Ms. Ross told Ms. Baynham that she should let her submit her resume "over there" because "we always got medical assistant positions coming up at out-patient" and if Ms. Baynham were to be hired across the street, she could watch

for email notifications from Ms. Ross regarding any MA positions that opened at the out-patient facilities.  After listening to Ms. Ross, Ms. Baynham agreed that her resume could be forwarded. On March 20, 2008, Ms. Baynham received a call from the secretary to Meridian's Director of Acute Services, Brian Donley ("Mr. Donley"), asking her to come to his office for an interview, which she did.  At the interview, Mr. Donley began discussing the job of a personal needs technician ("PNT").  A PNT works in an in-patient facility and reports to nurses, whereas an MA works in an out-patient setting and reports to doctors.  According to Meridian, the daily work of the two positions is otherwise nearly identical.  Mr. Donley was hiring for Meridian's in-patient program and offered Ms. Baynham a position as a PNT.  At that time, Ms. Baynham was still unaware of the affiliation of Meridian with the hospital.  Confused, Ms. Baynham told Mr. Donley that "Donna Ross sent me over here for an interview for a medical assistant position" and then asked Mr. Donley what a PNT was.  After Mr. Donley told her that a PNT was a "nurse's aid" position, Ms. Baynham told him "there must be some mistake," because she had been told there was an MA opening and she was a certified MA.  She then showed Mr. Donley her MA certification.

According to Ms. Baynham, after she showed Mr. Donley her certificate and resume, Charles Anstett[2] ("Mr. Anstett"), who was also at the interview, explained to Mr. Donley the distinction her MA certification represented and acknowledged that Ms. Baynham had "a lot of experience." With Ms. Baynham ready to leave the interview because she did not wish to accept a PNT position, Mr. Donley asked her if she would be willing to accept a position as a unit secretary, a position she had once held when working in Minnesota. A unit secretary's focus is on communication coordination and clerical activities within a particular in-patient unit.

---

[2] It is unclear from the record what position at Meridian Mr. Anstett held.

4

Remembering Ms. Ross's admonishment to get her "foot in the door," Ms. Baynham accepted the offer of employment at $13.25 per hour and attended a new employee orientation on April 10, 2008, before starting work on April 14, 2008.

At the orientation Ms. Baynham received a folder with materials which, among other things, included a Meridian employment handbook and a job description.  Sometime after the orientation, Ms. Baynham discovered that her job description was described in her paperwork as "unit secretary/PNT," and she filed an in-house complaint with Meridian in July 2008 claiming she was not hired as a PNT.  It is unclear from the record exactly what resulted from Ms. Baynham's complaint, but Meridian apparently agreed to strike any reference to PNT duties in her job description and Ms. Baynham continued to work as a unit secretary with Meridian until her termination.

In June and September 2008, open MA positions were posted by Meridian.  Ms. Baynham sought to be considered for both of those positions by responding to emails from Ms. Ross which announced the postings.  However, Meridian had a policy that required an employee to work six months in their position prior to seeking transfer to a new position within the organization.  Because she had yet to be employed for six months, Ms. Baynham did not qualify to fill those positions.  Ms. Baynham claims she was unaware of Meridian's requirement that she stay in her position for six months prior to being eligible for transfer.

On November 8, 2008, Mr. Donley gave Ms. Baynham a verbal warning regarding complaints he had received from several co-workers, patients and others regarding rude, impersonal and harsh comments made by Ms. Baynham during several conversations and interactions.  Mr. Donley memorialized the verbal warning on what Meridian calls an Employee Counseling Form ("ECF").  This first ECF issued to Ms. Baynham sets forth four specific

incidents and names two of the complaining co-workers, but does not provide the names of the patients or volunteers who are described as complaining parties.  In addition to the four specific incidents, the ECF concludes with a general concern:

> A number of other staff have complained that your interactions with co-workers, patients and visitors is often rude, harsh, raised voice and demanding. This behavior is inconsistent with Meridian standards of treatment of co-workers and customers.

Ms. Baynham took issue with the ECF and refused to sign it.  She did, however, provide a response, indicating that the two complaining co-workers had been rude to her and had yelled at her.  She wrote that visitors were always upset because there was no consistent enforcement of the visiting rules, and stated that she was aware of no other staff complaints regarding her work and in fact had received positive feedback from others.

Another MA position was posted by Meridian on November 20, 2008.  Ms. Baynham notified Ms. Ross that she was interested in the opening.  Ms. Baynham was interviewed by Barbara Wells, the practice manager for Medical Services, but was not selected to fill the position.  William True ("Mr. True"), a Caucasian male, was selected to fill the position.  Mr. True had recently completed his associate's degree in in Medical Assisting, was working on a bachelor's degree in Health Care Management and had eight years of experience as a medic in the United States Army.  Meridian found Mr. True to be better qualified than Ms. Baynham and other applicants for the open MA position.  Mr. True's hourly pay rate was set at $13.58 and he was paid at that rate until the June 2011, when he left Meridian's employ.

In March 2009, Ms. Baynham expressed interest in a part-time MA position that was posted.  She notified Ms. Ross that she would be interested in the part-time MA position if it were in Muncie, Indiana and she could pick up some additional hours in some other capacity to obtain a 40-hour work week.  When Ms. Baynham was informed that the part-time MA would

split time between Portland, Indiana and Muncie, Indiana, she informed Ms. Ross that she would not be interested in that position.

Another MA position opened up in one of Meridian's Muncie, Indiana facilities in June 2009. Ms. Baynham again let Ms. Ross know of her interest in the position. Ruth Ann Hosier ("Ms. Hosier"), a Caucasian Meridian employee who had been working as an MA at the New Castle, Indiana facility since August 2008, was selected to fill the position. In addition to her experience as an MA with Meridian, Ms. Hosier had an associate's degree from Ivy Tech in Medical Assisting. Ms. Hosier's hourly rate of pay was, and remains, $11.26.

On August 17, 2009, Ms. Baynham received a written warning from Mr. Donley for failing to attend a mandatory monthly staff meeting which had been held over the course of two days that month. The warning was in the form of a memorandum which stated that if she thought her absence was excused she should contact Mr. Donley and provide him with the circumstances. She was warned in the memorandum that any further similar incidents could result in further disciplinary action.

Ms. Baynham received her annual review in August 2009 as well. Her written evaluation related that a complaint had been registered with regard to Ms. Baynham's negative attitude by a patient's family and she was evaluated as needing improvement with regard to customer satisfaction. "Needs Improvement" was also the rating Ms. Baynham received under the category of "Teamwork," with the accompanying comment being that her negativity interfered with her being a team player at times. Ms. Baynham signed her evaluation, but added comments indicating she disagreed with that part of the evaluation which indicated she needed to improve in customer satisfaction and teamwork.

Kathy Lytle ("Ms. Lytle") was Ms. Baynham's direct supervisor on the unit floor, and she issued an ECF to Ms. Baynham on February 2, 2010 that addressed five concerns.  The first two were worded generally and referred to "ongoing" complaints from staff, visitors and patients regarding disrespectful, unprofessional and rude behavior on the part of Ms. Baynham as well as what was described as "passive aggressive" behavior in response to taking on her assigned tasks. Two more specific complaints dealt with her interaction with a staff member on January 29, 2010 with regard to a medical chart the coworker had asked for, and an occasion on the date the ECF was issued when she had left her area at a time she was supposed to be monitoring a client quiet room via video monitor.  The final complaint was another more general recitation of concerns regarding her unwillingness to be a good team member and look for ways to help others.  Ms. Baynham refused to sign the ECF.

On March 2, 2010, Ms. Lytle issued another ECF and suspended Ms. Baynham for a week.  The focus of that disciplinary write-up was a complaint that Ms. Lytle received from a family member with regard to rude treatment the family member received when phoning the unit, including being hung-up on and having to call back twice, the second time to register the complaint against Ms. Baynham with Ms. Lytle.  Ms. Lytle spoke with the family member, and related that she was crying while on the telephone while describing the rude treatment to Ms. Lytle.  As the unit secretary, Ms. Baynham was responsible for answering the telephone, though Ms. Baynham claims others would answer on occasion as well.  Ms. Lytle informed Ms. Baynham that she had heard her answer the telephone in a very rude manner in the past.  The ECF also mentioned an incident on February 25, 2010 when Ms. Baynham had left the unit desk unattended without notifying anyone where she was or what she was doing.  Finally, the ECF addressed a complaint from a staff member regarding a rude and intimidating message Ms.

8

Baynham had left on her voicemail.  Ms. Baynham again refused to sign the ECF, but did provide a written response in which she described the complaints as being "all lies."

Ms. Baynham filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on May 6, 2010.  In her charge she described the circumstance of her having to complain to have the PNT designation taken off her job description.  She also related that she received three ECFs and a five day suspension, contending that they were based on untruths and that Mr. Donley and Ms. Lytle were engaging in a pattern of discriminatory treatment.  She later amended her charge of discrimination, relating that on May 7, 2010 she had contacted Ms. Ross with regard to a job posting she had read about in the Sunday newspaper and an in-house MA posting and was told by Ms. Ross that she was ineligible to apply because she was under a disciplinary warning.  Ms. Baynham also stated in her charge that she had followed up that discussion with Ms. Ross by telephoning Harry Tallman ("Mr. Tallman"), the Human Resources Director at Meridian, to whom she had previously complained after receiving her suspension.  Mr. Tallman informed Ms. Baynham that she was ineligible to be considered for any other position at this point because it was Meridian's policy not to consider those employees who were under a disciplinary warning. He also advised Ms. Baynham that he was in agreement with all of the discipline to which she had been subjected.

There was an opening for an MA in early May 2010, and Ms. Baynham was informed by Ms. Ross that she was ineligible because of the written discipline she had received in the past ninety days.  The MA position was filled by Cynthia Walker, an African-American female with an associate's degree in medical assisting from Ivy Tech.  She was compensated at $12.67 per hour.

The EEOC sent Meridian's Human Resources Department a copy of the original charge of discrimination as well as the amended charge of discrimination and retaliation, which Ms. Baynham filed on May 20, 2010.  As a result, Mr. Tallman and Ms. Ross were made aware of Ms. Baynham's claims of discrimination, but they did not, in turn, inform Mr. Donley or Ms. Lytle of the discrimination charges.  During her tenure with Meridian, Ms. Baynham never told Mr. Donley, Ms. Lytle, Ms. Ross or Mr. Tallman that she believed she was being discriminated against on the basis of her race, nor did she raise such a complaint with any other manager at Meridian or in any of her written responses to discipline notices.

On May 21, 2010, Ms. Lytle witnessed Ms. Baynham and other employees having a conversation regarding a patient who had allegedly made a racial remark.  Michelle Niccum ("Ms. Niccum") was behind Ms. Baynham at the unit desk and informed Ms. Baynham and others near the desk that she had heard a particular patient make another racial remark.  One of the other employees, Angela Carter ("Ms. Carter"), began mimicking the patient who had made the racial remark and Ms. Baynham and the other employees in the area responded with laughter to her imitation.  All of this occurred while patients and other staff members were on the unit floor.  Other behaviors exhibited by the unit staff had concerned Ms. Lytle that week, so she scheduled a meeting with four of the employees and Ms. Ross, as a representative of Human Resources, to discuss the lack of empathy or concern for the potential embarrassment of the elderly patient, the non-discrimination policies of Meridian and the very public manner in which the employees were engaged in discussing the incident.  Ms. Baynham and Ms. Carter, who are both African-American, and Ashleigh Wyne and Holly Williamson, both Caucasian employees, were directed to attend the meeting.

Before the meeting could get started, Ms. Baynham demanded to be told why she was invited to the meeting, stating she had nothing to do with the mimicking that was done of the patient.  Ms. Lytle told her that she was one of the employees laughing at Ms. Carter's actions, so she needed to be at the meeting as well.  Ms. Baynham stated "I had nothing to do with this and I do not need to be here."  Ms. Baynham also told Ms. Lytle that she was tired of Ms. Lytle accusing her of things she did not do and got up to leave the room.  Ms. Lytle informed Ms. Baynham that she needed to be a part of the meeting, but Ms. Baynham ignored her and walked out of the room.

Ms. Baynham subsequently received her fourth ECF for walking out of the meeting after her supervisor specifically asked her to stay and attend.  Under Meridian's disciplinary policy, a written disciplinary warning remains on an employee's record for twelve months and four written warnings within twelve months is cause for termination.  Any termination must be approved by Meridian's President/CEO.  With Mr. Donley approving as well, Ms. Lytle met with Ms. Baynham on June 2, 2010, to discuss the fourth ECF and to notify her that she was being terminated.  Ms. Baynham refused to sign the ECF and later filed another charge of discrimination with the EEOC, claiming her termination was retaliatory.

## III.   DISCUSSION

### A.   Statute of Limitations

Ms. Baynham asserts claims under both Title VII and 42 U.S.C. § 1981.  For purposes of liability, the same substantive standards apply to claims under either statute.  *Thanongsinh v. Board of Educ.* 462 F.3d 762, 782 (7th Cir. 2006).  Nevertheless, there are different time limitations and restraints on bringing the claims.  Before bringing suit under Title VII, a plaintiff must exhaust their administrative remedies by filing a charge of discrimination with the EEOC,

or comparable cooperating state agency, within 300 days of the conduct complained of. *Salas v. Wisconsin Dept. of Corrections,* 493 F.3d 913, 921-22 (7th Cir. 2007). Failure to file a timely charge with the EEOC precludes a subsequent lawsuit under Title VII. *Beamon v. Marshall & Isley Trust Co.,* 411 F.3d 854, 860 (7th Cir. 2005). A plaintiff is under no such exhaustion requirement when bringing a cause of action under § 1981, but must bring the claim within two years if it arises out of the pursuit of employment[3] and within four years if the claim is based on post-hire conduct. *Fane v. Locke Reynolds, LLP,* 480 F.3d 534, 539 (7th Cir. 2007); *Dandy v. United Parcel Service, Inc.,* 388 F.3d 263, 269 n.4 (7th Cir. 2004). For limitations purposes, discrete employment actions such as, termination, discipline, or refusal to hire or promote, are deemed to have been taken the day they occur. *Beamon,* 411 F.3d at 860.

Meridian argues that any claim Ms. Baynham asserts for conduct which occurred more than 300 days prior to her filing an EEOC charge is barred as untimely. Meridian's argument is correct with regard to Ms. Baynham's Title VII claims. Nevertheless, this has very little practical impact because, as noted above, the substantive standard for judging liability under

---

[3] In *Jones v. R.R. Donnelley & Sons Co.,* 541 U.S. 369 (2004), the Supreme Court examined 28 U.S.C. § 1658, the four-year catch-all statute of limitations applicable to civil actions arising out of Acts of Congress which were passed after December 1, 1990. It determined that hostile work environment, wrongful termination, and failure-to-transfer claims under 42 U.S.C. § 1981 were governed by that four-year limitations period because those claims were in essence "enacted" by the 1991 Civil Rights Act, which overturned *Patterson v. McLean Credit Union*, 491 U.S. 164, (1989) "by defining the key 'make and enforce contracts' language in § 1981 to include the 'termination of contracts and the enjoyment of benefits, privileges, terms, and conditions of the contractual relationship." *Jones,* 541 U.S. at 383. Prior to *Jones,* actions brought under § 1981 were subject to the most analogous personal injury statute of limitations borrowed from the state where the action was brought; and, in Indiana that statute of limitations was, and remains, two years. *E.g., Jones v. Merchants Nat. Bank & Trust Co. of Indianapolis,* 42 F.3d 1054, 1058 (7th Cir. 1994).

What the Supreme Court did not directly address in *Jones* is the question of whether the borrowed state statute of limitations still applies to a § 1981 claim for failure to hire, or other discriminatory conduct related to the initial "employment contract", which claim could be pursued under § 1981 even prior to the 1991 Civil Rights Act. In a footnote to its decision in *Dandy v. United Parcel Service, Inc.*, 388 F.3d 263, 269 n.4 (7th Cir. 2004), the Seventh Circuit has suggested that the answer to that question is that the borrowed statute still applies to a § 1981 claim which was actionable prior to the 1991 Civil Rights Act.

§ 1981 is the same as that for Title VII and the four year statute of limitations has not run. However, Meridian's timeliness challenge is effective with regard to one type of claim under § 1981, and that is any claim Ms. Baynham is asserting with regard to her initial hire at Meridian.  Any claim based on that initial offer of employment, including the in-house categorization of that employment as "Unit Secretary/PNT" or Meridian's failing to offer her a MA position when she first applied should have been brought within two years of her starting work on April 14, 2008.  This lawsuit was not filed until January 26, 2011, well past the two-year limitations period which applies to such a claim.   Accordingly, summary judgment is granted in favor of Meridian on the claims regarding Ms. Baynham's initial hire.

**B.      Hostile Work Environment**

In paragraph 11 of her Complaint, Ms. Baynham claims that she "was subjected to a hostile work environment," because she was closely monitored at work, frequently falsely accused of "doing things," often required to complete the work of another Unit Secretary, and ignored when she would register complaints.  She was suspended for five days and also claims to have been underpaid when she received "paid time off" from work.  When reviewed in context, the testimony of Ms. Baynham at deposition reveals that she is clearly not asserting that her working environment at Meridian was racially tinged in any sense; rather, she describes as "harassment" what she perceives to be the unfair disciplinary scrutiny by Ms. Lytle and Mr. Donley.

Ms. Baynham's complaints are not the type of conduct that would sustain a claim that she was subjected to a hostile work environment.  The Seventh Circuit has stated:

> To survive summary judgment, an employee alleging a hostile work environment must show that: (1)[s]he was subject to unwelcome harassment; (2) the harassment was based on race; (3) the harassment was severe or pervasive so as to

13

alter the conditions of the employee's work environment by creating a hostile or abusive situation; and (4) there is a basis for employer liability.

*Porter v. Erie Foods Intern., Inc.,* 576 F.3d 629, 634 (7th Cir. 2009) (quoting from *Williams v. Waste Management of Illinois, Inc.,* 361 F.3d 1021, 1029 (7th Cir.2004)). More specifically, the plaintiff must show that the work environment was both subjectively and objectively hostile. *Mannie v. Potter,* 394 F.3d 977, 982 (7th Cir. 2005). Ms. Baynham may have been subjected to unwanted disciplinary scrutiny, but there is no evidence that there was any accompanying racial animus.

Ms. Ross, an African-American, witnessed Ms. Baynham's insubordinate departure from the May 21, 2010 meeting and also confirmed, in her role as a Human Resources professional at the company, that Meridian followed its disciplinary policies in issuing all the warnings given to Ms. Baynham. Moreover, the evidence of record makes clear that from the very first time she faced discipline, Ms. Baynham became defensive and confrontational with her supervisors. While she refused to sign any of the disciplinary warnings, she did write out responses to the disciplinary warnings and never once wrote or stated to anyone at Meridian that she believed any of the discipline she received was motivated by race. In short, as their work relationship aged, it would be fair to infer from the evidence that Ms. Lytle became more critical of Ms. Baynham's performance or attitude at work. Whether or not that criticism was warranted may be a subject 0open to disagreement, and whether there is evidence that Ms. Lytle harbored a hidden bigoted agenda can be reviewed in connection with the specific adverse employment actions Ms. Baynham complains of. What is unambiguously certain from the evidence is that Ms. Baynham faced no openly hostile race-based harassment from supervisors and was not the victim of a racially hostile work environment.

## C.     Discrete Discriminatory Acts

The fact that Ms. Baynham was not subject to a hostile work environment does not rule out the possibility that her employer took adverse actions against her on the basis of her race.  As previously discussed, the four year statute of limitations in 28 U.S.C. § 1658 applies to all § 1981 claims predicated on an employer's post-hire actions, thereby mooting any timeliness defense to the determination of liability with regard to the post-hire actions complained of by Ms. Baynham.  Those actions include Meridian's failure to put Ms. Baynham into any of the MA positions which became available during her tenure, and the issuance to her of disciplinary warnings, which eventually led to her termination.

While momentum has been gaining for the articulation of a singular route to proving discrimination, *see Coleman v. Donahoe,* 667 F.3d 835, 863 (7th Cir. 2012) (Wood, J., concurring), the law at this point still recognizes two methodologies, the so-called direct and indirect methods of proof.  *Arizanovska v. Wal-Mart Stores, Inc.,* 682 F.3d 698, 702 (7th Cir. 2012).  The direct method of proof requires either direct or circumstantial evidence which points directly at a discriminatory reason for an employer's action, without resort to any inference. *Harper v. C.R. England, Inc.,* __ F.3d __, 2012 WL 2053574, *5 (June 8, 2012 7th Cir.).  It is tantamount to an admission by the employer.  No such evidence has been presented in this case and Ms. Baynham makes no argument that the direct method of proof is applicable.  Rather, like in most cases, the evidence of discrimination relied upon by Ms. Baynham is purely circumstantial and requires an inferential link before any conclusion of discrimination can be drawn.  As such, she must follow the indirect method of proof to advance her claims, with an application of the burden shifting analysis first announced in *McDonnell Douglass Corp. v. Green*, 411 U.S. 792 (1973).

In order to avoid summary judgment utilizing the indirect burden-shifting analysis, a plaintiff must first establish a *prima facie* case of discrimination by demonstrating that: (1) she is a member of a protected class; (2) she met her employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of the protected class received more favorable treatment. *Keeton v. Morningstar, Inc.,* 667 F.3d 877, 884 (7th Cir. 2012) (citing *Everroad v. Scott Truck Systems, Inc*., 604 F.3d 471, 477 (7th Cir.2010)).  In the case of an employer's failure to promote, which is essentially Ms. Baynham's contention with respect to the open MA positions she was denied, a plaintiff may establish her *prima facie* case by showing that:  (1) she is a member of a protected group; (2) she was qualified for the position sought; (3) she was rejected for the position; and (4) the employee who was promoted was a member of a different race and was not better qualified than her.  *Nichols v. Southern Illinois University-Edwardsville,* 510 F.3d 772, 783 (7th Cir. 2007).

If the plaintiff establishes a *prima facie* case of discrimination, the burden then shifts to the employer to offer a non-discriminatory reason for the adverse employment action.  *Keeton*, 667 F.3d at 884.  If the employer articulates a nondiscriminatory reason for its action, the burden shifts back to the plaintiff to submit evidence demonstrating that the employer's explanation is a lie or pretext for discrimination.  *Id*.

Ms. Baynham is an African American, so there is no issue with regard to the first element of her *prima facie* case.  The remaining elements are distinct with respect to the particular conduct which she claims was discriminatory on Meridian's part.

### 1.    Transfer/Promotion to Open MA Positions in June and September 2008

Meridian claims that in denying Ms. Baynham a transfer to the open MA positions in June and September 2008 it was merely enforcing its policy that an employee must be in their

16

current position for six months before seeking a transfer to another position.  Subsection 1.5 of Meridian's employee handbook sets forth its policy regarding an employee's pursuit of a transfer to another position within the company:

> APPLICATION FOR TRANSFER – Employees who have completed at least six (6) months of service in their present position and are in good standing may apply for a lateral transfer to a position vacancy.  The employee's application will be evaluated and s/he may be interviewed with regard to his/her skills and qualifications for the vacant position and will be given preference for that position if his/her skills/qualifications at least equal those of other candidates being considered.

Meridian also contends that its denial of the transfer was not an adverse employment action because there would have been no significant quantitative or qualitative change in the terms of Ms. Baynham's employment had she received the transfer.  *See Haywood v. Lucent Technologies, Inc.,* 323 F.3d 524, 532 (7th Cir.2003) (delay in transfer found not to be a quantitative or qualitative change in plaintiff's employment).  However, that argument is without sufficient evidentiary support. While the record reflects what hourly wage was paid to each person who filled the MA positions Ms. Baynham sought after she achieved her six months of tenure, there is no indication in the record with regard to who filled the June or September 2008 MA openings or how much those people were paid.  Furthermore, Ms. Baynham was seeking to move from a Unit Secretary position to the MA position and Meridian has offered no evidence in conflict with Ms. Baynham's assertion that the MA job is more desirable.  Accordingly, for purposes of applying the *McDonnell Douglas* template, the Court will treat the instances where Ms. Baynham sought an open MA position as a refusal to promote.[4]

---

[4] Meridian has established that there is little to no difference between the duties of a PNT and a MA, but the record does not illuminate the distinctions between a Unit Secretary and an MA.  However, even if calling the transfer to an MA position a "promotion" is a stretch, the elements of a *prima facie* case would not change materially if viewed as a simple failure to hire claim.  The *prima facie* case for a failure to hire claim requires a showing that: (1) the applicant is a member of a protected group; (2) she applied for and was qualified for the position; (3) she did not receive the position; and (4) the person hired was not in the protected group and had similar or lesser qualifications.

There is no question that Ms. Baynham was qualified for any MA position available at Meridian in 2008, and her performance at work did not become an issue until she was first issued a disciplinary warning in November 2008. Therefore, the Court turns to the final requirement that Ms. Baynham demonstrate that a less qualified individual who is not African American received the position. Ms. Baynham has not done this, as the record is void of any indication as to who received the MA positions posted in June and September of 2008.

Even if the Court excused Ms. Baynham's failure to show that a non-African American was awarded those positions, Meridian's assertion of a non-discriminatory reason for denying the transfers/promotions results in a shift of the burden back to Ms. Baynham to offer evidence to support a conclusion that the stated reason is a lie or pretext for discrimination. On that front, Ms. Baynham falls short again. She argues that Meridian failed to submit evidence of the effective date of any "no transfer for six months" policy, but the policy was a part of the employee handbook that Ms. Baynham agrees she received at the new employee orientation and Ms. Baynham herself acknowledges the existence of the policy in a June 2008 email exchange with Ms. Ross regarding the June 2008 MA opening. Ms. Baynham also questions why Ms. Ross would inform her of the opening if such a policy existed; but, Ms. Baynham was informed by blanket emails which Ms. Ross sent out to numerous employees and not specifically to Ms. Baynham. In the end, there is no evidence that Meridian's legitimate non-discriminatory reason for denying the transfers is pretext.

### 2.       Transfer/Promotion to Open MA Position in November 2008

Ms. Baynham received an interview for the open MA position which Meridian posted on November 20, 2008. Nevertheless, she was not selected and a Caucasian male filled the

---

*Lawhead v. Ceridian Corp.*, 463 F. Supp.2d 856, 862 (N.D.Ill. 2006) (citing *Zaccagnini v. Charles Levy Circulating Co.*, 338 F.3d 672, 675 (7th Cir.2003).

position.  Meridian points to Mr. True's two year associate's degree and his eight years as a medic in the armed services, claiming he was a more qualified applicant for the MA opening than Ms. Baynham.  Ms. Baynham disagrees, claiming Mr. True had yet to obtain his associate's degree or MA certification when he applied at Meridian and his experience as an Army medic did not "describe" work experience equivalent to the job requirements for a MA job at Meridian.

The record shows that Mr. True graduated with his associate's degree in October 2008, before he was hired as a MA at Meridian, and his transcripts show he even completed more than the required 96 credit hours of course work.  The fact that he had submitted his application to Meridian in the summer before his graduation is irrelevant.  Furthermore, at the time he was hired at Meridian, he had started pursuing his master's degree in Health Care Management at Harrison College.  In contrast, Ms. Baynham's "course of study certification" from Brown Institute in Minnesota only states that it certifies that she completed a course in "Medical Business Clinical Specialist," which she claims was a one year course of study.  Finally, Ms. Baynham's own opinion that Mr. True's experience as a medic was not comparable to her own, is of no evidentiary value.  A plaintiff's self-serving assertions or opinions, without a developed supporting factual record are of no value in avoiding summary judgment.  *Weeks v. Samsung Heavy Industries Co., Ltd.,* 126 F.3d 926, 942 (7th Cir. 1997).  In the end Ms. Baynham has no support for her claim that Mr. True was not a more qualified candidate for the MA position in November 2008.

### 3.	Transfer/Promotion to Open MA Position in June 2009

Ms. Baynham was not selected for an interview when an MA position for one of Meridian's Delaware County facilities was posted in June 2009.  The job was awarded to Ms. Hosier, a Caucasian female who sought a transfer from her MA position at Meridian's New

19

Castle, Indiana facility.  Ms. Hosier had both experience within Meridian as an MA and an associate's degree.  Meridian asserts she was the most qualified candidate.

Ms. Baynham misinterprets an email from Ms. Hosier to Ms. Ross, notifying Ms. Ross of Ms. Hosier's intent to apply for the posted MA position, as providing some type of extra notice to Ms. Hosier that Ms. Baynham did not receive.  That is not at all what the submitted email chain reflects.  Further, the record is clear that the opening was posted by Meridian and Ms. Baynham's deposition testimony makes it clear that she was aware of the job posting, notified Ms. Ross of her interest and now believes she was never considered for the position.  The fact that Ms. Baynham was not interviewed neither proves that she was not considered for the position nor negates the fact that a candidate undeniably more qualified was awarded the job. Furthermore, the record reflects that Ms. Baynham's MA certification with the National Allied Health Test Registry required annual renewal, but she never provided the Human Resources Department with an update or renewal notice.  Ms. Hosier's MA experience with Meridian and additional educational training trumps any claim that Ms. Baynham was as qualified for the position, so again she fails to establish a *prima facie* case.

### 4.    Transfer/Promotion to Open MA Position in May 2010

Ms. Baynham pursued consideration for an open MA position posted by Meridian in May 2010.  This time, Ms. Baynham was informed that pursuant to Meridian's policies, she would not be considered for the position because she was under a disciplinary warning.  The MA position was filled by an African American female, Cynthia Walker, who held an associate's degree.

Ms. Baynham contends that Meridian did not always apply its policy requiring an applicant for transfer to be in "good standing," and cites as an example her own circumstance in November 2008.  At that time she was actually interviewed for the open MA position despite her

20

having received her first ECF just a few days prior.  Nevertheless, the uncontested affidavit testimony of Ms. Ross indicates that an employee's "good standing" is not affected by a verbal warning, which is the type of warning Mr. Donley memorialized in the ECF from November 2008.  Regardless, Ms. Baynham cannot make her *prima facie* case with regard to this instance of non-promotion because the person who filled the position, Cynthia Walker, was an African American and, therefore, a member of the same protected group as Ms. Baynham.

     **5.**      **Disciplinary Acts**

Ms. Baynham does not specifically argue that the disciplinary warnings she received were adverse employment actions; rather, she asserts they were part of the hostile work environment she believes she was subjected to.  As previously explained, Ms. Baynham's contention that she was subjected to a hostile work environment is belied by the fact that she admits that there was no open or overt racial element to any of the disciplinary warnings she received.  If Meridian's issuance of disciplinary warnings to her was racially motivated it was not overtly so and was not part of any openly hostile environment.

To qualify as an adverse employment action, an employer's act or decision must materially alter the terms or conditions of a plaintiff's employment.  *Oest v. Illinois Dept. of Corrections,* 240 F.3d 605, 612-13 (7th Cir. 2001) (written reprimands received as part of progressive discipline system not considered to be adverse employment actions).  Disciplinary warnings that do not result in "tangible job consequences" do not constitute adverse employment actions.  *Id*. at 613.  To that end, the verbal warning and disciplinary memo which Mr. Donley issued to Ms. Baynham are not adverse employment actions because neither resulted in a tangible job consequence.

On the other hand, where, as here with the written warnings issued by Ms. Lytle, a disciplinary action renders an employee ineligible for promotion or leads to the employee's termination when considered together with other similarly issued discipline, the discipline can qualify as an adverse employment action. *Id.*; *see also, Whitaker v. Northern Illinois University,* 424 F.3d 640, 647-48 (7th Cir. 2005).  Consequently, the ECFs issued by Ms. Lytle, which caused Ms. Baynham to be ineligible to transfer to the MA position she sought, and the last of which ultimately led to her termination, do qualify as adverse employment actions and satisfy the second element required to establish a *prima facie* case under the indirect method of proof. Consequently, the Court will examine whether the record demonstrates that the remaining elements of the *prima facie* case have evidentiary support.

### 6.    Written ECFs of February 3, 2012 and March 2, 2012

Ms. Baynham's *prima facie* case of discrimination with regard to these adverse actions falls short at the fourth step which requires that she show that similarly situated employees who are not African American were treated more favorably.  She makes no effort to supply the record with examples of other employees who received complaints because of their demeanor or attitude which might assist her in showing that those employees had not been disciplined or were subject to lesser discipline.  Instead she maintains that the disciplinary warnings issued by Ms. Lytle were lacking because there were no witness statements attached from complaining staff, patients or family members and, hence, no proof that she was rude.  She contends as well that Ms. Lytle could not have been sure that it was Ms. Baynham who was the subject of customer complaints because others answered the telephone and Meridian has not pointed to a policy or job description that required a Unit Secretary to help others or to keep an eye on the quiet room video monitor.

Ms. Baynham misses the point here.  First, Meridian need not prove that Ms. Baynham was rude or that it had policies to support every criticism it had of her performance.  The very suggestion by Ms. Baynham that, in order for Meridian to be critical of her failure to help out other employees it had to have a policy that required her to do so, seems to underscore Meridian's contention that she had an attitude problem.  In any event, it is certainly not supportive of her case.  Further, it is not Meridian's burden to show total conformance with any or all of its policies.  In fact, under the indirect method of proving discrimination, the burden never shifts from Ms. Baynham to Meridian until Ms. Baynham establishes her *prima facie* case.  That requires her to offer evidence of similarly situated employees who were accused of some similar misconduct but were treated more favorably.  Nowhere in her brief does Ms. Baynham attempt to sustain her obligation of identifying non-African American employees who were treated more favorably under similar disciplinary circumstances, and the evidentiary record is empty in that regard.

### 7.     Final ECF and Termination for Insubordination

The final ECF issued by Ms. Lytle to Ms. Baynham occurred when she walked out of a meeting Ms. Lytle had asked her to attend.  The meeting was called to address the course of conduct of four employees while in the unit, three of whom listened and laughed while another openly mimicked a patient's comments.  Ms. Baynham took issue with being asked to attend the meeting and, despite her supervisor's direction to stay and participate, she walked out of the meeting after telling Ms. Lytle she was tired of her making up things about her and that "this does not concern me."  Because this was her fourth disciplinary warning, Meridian terminated Ms. Baynham's employment.

Ms. Baynham admits in her deposition that she was laughing at the employee's imitation of the patient, and that she was asked to attend the meeting by Ms. Lytle.  However, she takes issue with the fact that Ms. Lytle did not say anything at the time the incident happened and that Ms. Lytle did not ask a white employee, Michelle Niccum, to attend the meeting.  Ms. Baynham claims Ms. Niccum had initiated the whole incident by reporting to the others the fact that the patient had made the comment that ended up being imitated by another employee.  Ms. Baynham also claims there is no evidence to support a claim that she was insubordinate.

The Court does not agree with Ms. Baynham's contention that there is no evidence of her insubordination.  The sworn affidavits of both Ms. Lytle and Ms. Ross specifically recount the request that Ms. Baynham stay and attend the meeting and her contentious departure nonetheless. In her own deposition Ms. Baynham admits she was asked to attend the meeting.  The racial make-up of those who were asked to attend the meeting was 50/50 and while Ms. Niccum was not asked to attend, there is no evidence that she was part of the group laughing at the mimicked remark or that Ms. Lytle was aware that she had reported the comment to begin with.  In the end, whether Ms. Baynham believed her departure from the meeting was warranted or not, she was clearly insubordinate when she walked out after being asked to stay by Ms. Lytle.  To proceed past summary judgment with her claim of discrimination, she would need to show that others who were insubordinate were not subject to a disciplinary write-up or that other non-African Americans who had four disciplinary warnings within a year were not terminated.  She makes no attempt to do so, consequently summary judgment on those claims are in order as well.

### 8.    Retaliation

Finally, there is Ms. Baynham's retaliation claim.  A plaintiff may employ the direct or indirect method of proof to establish a retaliation claim.  *Harper v. C.R. England, Inc.,* __ F.3d

__, 2012 WL 2053574, *5 (June 8, 2012 7th Cir.).  To establish retaliation under the direct method, Ms. Baynham must present evidence to show that: (1) she engaged in a statutorily protected activity; (2) she suffered a materially adverse action; and (3) a causal connection exists between the two.  *Id.*  Under the indirect burden-shifting approach, Ms. Baynham must show that:  (1) she engaged in a statutorily protected activity; (2) she was performing her job satisfactorily; (3) she suffered a materially adverse employment action; and (4) she was treated less favorably than a similarly situated employee who did not engage in the statutorily protected activity.  *Id.* at *7.  Under either method of proof there must be some evidence that the person(s) responsible for the decision which adversely impacted Ms. Baynham were aware of her engaging in the protected activity.  *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 668-69 (7th Cir.2006).

On May 6, 2010, Ms. Baynham filed her initial charge of discrimination with the EEOC, an action which is clearly a protected activity.  On May 13, 2010, the EEOC sent notice and a copy of the charge to Mr. Tallman, the Human Resources Director at Meridian.  On May 20, 2010, Ms. Baynham filed an amendment to her discrimination charge, and on May 26, 2010 that amended charge was sent by the EEOC to Mr. Tallman.  Mr. Tallman shared the charges with Ms. Ross, who worked with him in Human Resources.  However neither Mr. Tallman nor Ms. Ross informed Mr. Donley or Ms. Lytle of the charges prior to the decision to terminate Ms. Baynham for insubordination.

Ms. Baynham claims she was the victim of retaliation following her filing of charges, pointing first to May 10, 2010, when Meridian rejected her May 7, 2010 request to be considered for open MA position which had been posted.  As was explained to her, the rejection was based upon the fact that Ms. Baynham had been disciplined within ninety days of the transfer request

and there is no evidence of record which would cast doubt on the veracity of that explanation. Furthermore, the EEOC had not yet sent Meridian a copy of the initial discrimination charge filed by Ms. Baynham, and there is no other evidence of record which would support a conclusion that any decision-maker at Meridian was aware of Ms. Baynham's May 6, 2010 EEOC charge.   Finally, suspicious timing alone is insufficient to support a retaliation claim. *Palermo v. Clinton,* 457 Fed. Appx. 577, 579-80 (7th Cir. 2012).

On June 3, 2010, Ms. Baynham was terminated for the incident on May 21, 2010 when she walked out of a meeting her supervisor had asked her to attend.   By that point in time Mr. Tallman and Ms. Ross were aware of both the initial charge and the amended charge of discrimination filed by Ms. Baynham.   Meridian argues that, Mr. Donley and Ms. Lytle were the persons who made the decision to terminate Ms. Baynham and their ignorance of the charges requires a finding that there could be no retaliation.   Even if the Court stretches so far as to give Ms. Baynham the benefit of an inference of knowledge, insofar as Human Resources (Mr. Tallman or Ms. Ross) may have been made aware of the fact that Mr. Donley and Ms. Lytle were proceeding with a termination after Ms. Baynham received her fourth ECF within a year, Ms. Baynham still cannot survive summary judgment.   By that point in time, she was not performing her job to the reasonable expectation of Meridian (i.e. her insubordination) and she has offered no evidence of anyone who had not engaged in protected activity and who also had been the subject of significant discipline, but was treated more favorably.   Again, Ms. Baynham is relying only on the timing of her termination to support her retaliation claim; however, it was Ms. Baynham who controlled the timing of her refusal to attend Ms. Lytle's meeting, which is the key event precipitating her termination.

Ms. Baynham's retaliation claims do not pass muster under either method of proof and summary judgment in favor of Meridian is warranted.

## IV.   <u>CONCLUSION</u>

For the reasons set forth in this Entry, Meridian's Motion for Summary Judgment (Dkt. #60) is **GRANTED**.  A separate final judgment shall enter in favor of Meridian Services Corp. with costs.

SO ORDERED.     08/21/2012

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Bobby Allen Potters
POTTERS LAW FIRM
bpotters@aol.com

Jennifer J. Abrell
DENNIS, WENGER & ABRELL, P.C.
abrelljj@dwapc.com

Mark R. McKinney
DENNIS WENGER & ABRELL
mckinneym@dwapc.com

Michael Gregory Foley
DENNIS WENGER & ABRELL P.C.
foleym@dwapc.com